**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| RICHARD AVENIDA, | Civil No.    07-cv-286 MJL (POR) |
| Petitioner, | |
| | **ORDER DENYING PETITION FOR** |
| vs. | **WRIT OF HABEAS CORPUS** |
| JAMES WALKER, Warden, | |
| Respondent. | |

## I.    INTRODUCTION

Richard Avenida ("Avenida" or "Petitioner") a state prisoner proceeding pro se, has filed a Petition for a Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 challenging his Tulare County Superior Court conviction in case number 87068 for first degree murder (Cal. Penal Code § 187), attempted murder (§§ 664, 187), felony shooting at an inhabited dwelling (§ 246), and street terrorism (§186.22(a)). (Lodgment No. 10 at 563.) As to the murder count, the jury also found true that Petitioner had personally discharged a firearm and that the murder was committed for the benefit of, or in association with, a criminal street gang (§§ 12022.53 (d)(e)(1), 186.22(b)(1)). (*Id*. at 524, 563.) Avenida was sentenced to state prison for life without possibility of parole plus twenty-five years, consecutive to another life sentence for the gun enhancement. (*Id*. at 563.) He was sentenced on the attempted murder conviction to life with possibility of parole, plus a term of twenty-five years, plus twenty-five years to life for the gun enhancement. (*Id*.) Avenida contends his federal constitutional rights were violated because there was insufficient evidence to support the conviction, and he was

denied the effective assistance of counsel. (*See* Pet. at 9, 29.)

The Court has considered the Petition, Respondent's Answer, Petitioner's Traverse and all the supporting documents submitted by the parties. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court **DENIES** the Petition.

## II.   **FACTUAL BACKGROUND**

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C.A. § 2254(e)(1)(West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness). The facts as found by the state appellate court are as follows:

Carlos Cortez was 17 years old when, on January 20, 2002, he was killed by a gunshot to the head. He and his friend Francisco (Frank) Mendoza had been talking in the driveway of Mendoza's residence. Mendoza heard Cortez say "what the F," looked and saw a car passing by and, having a bad feeling about the situation, made his way through his open garage and into his home. Cortez followed. Mendoza entered his kitchen from the garage, lifted his telephone receiver, looked back into the garage, and saw a man shooting in his direction. He felt a bullet pass close to his face, fell to the floor, and scrambled to his back yard. A neighbor heard gunshots and called 911.

Cortez lay bleeding on the floor in Mendoza's garage. He had been shot by a semiautomatic .40-caliber Glock pistol. Bullets also had penetrated the walls in Mendoza's living room and kitchen. Numerous cartridge cases found at the scene were determined to have come from the same gun that was used to kill Cortez.

At some point before officers arrived at his home, Mendoza retrieved a gun from under Cortez's body and hid it under a couch cushion inside the residence. When officers arrived, Mendoza lied to them about the gun he had hidden inside. Eventually, officers discovered the gun and confronted Mendoza with that fact. Mendoza then admitted he had taken and had hidden the gun. He explained at trial that he "just reacted, to do that. I just picked it up and I put it away." Investigators found gunshot residue on Mendoza's hands the day of the murder but they considered him a victim, not a suspect.

Mendoza told the officers about a vehicle he saw passing by just before the shooting, describing it as a purple Dodge Stratus. He was unable to describe the occupants of the vehicle other than to say there were three of them, that he had the impression the front passenger was bald-headed, and that the rear passenger was wearing a dark-colored, hooded windbreaker. He believed that the person he saw firing in his direction at the door to the garage was the person in the hooded windbreaker. Mendoza was never able to identify an assailant, either at trial or in any out-of-court attempt.

Within days of the shooting, Detective Mark Lopez put together a photographic display of three vehicles: two were Dodge Stratus models, one was appellant's Chrysler Cirrus. The three vehicles were of varying shades of purple or maroon. Detective Lopez showed the display to Mendoza, who said that vehicle number 1 (car #1) in the display-which was appellant's vehicle - was the "most similar" to the subject vehicle. Some days later, Detective Lopez took Mendoza to a tow yard and showed him a particular

vehicle. Mendoza thought the vehicle looked like the one in question. Though the color did not look right at first, it looked more similar when the vehicle was moved to sunlight. Though Mendoza had not seen the grille on the vehicle that passed by his home, because he had only seen the car from the side, he noted that the vehicle in the tow yard had a grille different than a Dodge Stratus would have. As Mendoza said at trial, he was not "100-percent sure" it was "the exact same car."

The vehicle in the tow yard was appellant's purple, 1996 Chrysler Cirrus. It had been taken to the yard when appellant was arrested on February 2, 2002. Investigators found a copy of a local newspaper for January 21, 2002, the day after the murder, in the trunk of the car.

A police officer testified that the photograph in an exhibit presented at trial displayed appellant's car as it appeared on February 4, 2002. Tony Gutierrez testified that he had been the registered owner of the car in question, a "purplish" 1996 Chrysler Cirrus, until December 2001, when appellant took over payments. When appellant took over the car, it did not have tinted windows and had hubcaps, not see-through rims. An officer who photographed the car on February 4, 2002, testified that the car had no tinted windows and that the wheels appeared to him to be alloy. Tony Gutierrez testified that he took the car back after appellant's arrest, and that the car still had no tinted window and did have hubcaps, not chrome wheels.

Appellant's apartment was searched after his arrest. Amongst the various items seized were three dark hooded jackets.

Detective Lopez prepared three 6-person photographic lineups of suspects, in one of which appellant appeared.

The Witnesses

Detective Lopez showed the photo display of vehicles, with appellant's Cirrus as car #1, to several witnesses.

Salvador Vargas had been visiting a friend in the neighborhood where the murder occurred. A month after the murder, Vargas told Detective Lopez that he had been playing catch in the street on Ferguson Avenue when a purple car, which he thought was a Ford or a Lincoln, drove by. There were three occupants of the car, and they had "mad-dogged" him as they drove by. Detective Lopez showed Vargas the photo display of cars, and Vargas said #1 was the "best color" match. The car he saw drive by could have been a Stratus, but he thought it was "more like a Lincoln." He was able to say the front passenger had appeared to be in his 20's, and was bald and had a light complexion. Vargas made no in- or out-of-court identifications other than to provide this information. At trial, he could remember very little of what had occurred or what he had told Detective Lopez.

Ten days after the shooting, Detective Lopez interviewed Michael Yado, who was 16 years old at the time of trial in 2003. Michael said he was near the intersection of Divisadero and Ferguson when he saw a dark-colored car drive east on Ferguson, turn onto Divisadero, and park. Michael saw two men get out of the car and pull dark sweaters over their heads. They crouched and ran along the corner house to the second house from the corner, where they ran toward an open garage and opened fire with about six shots. Then they ran back to the car and left. One of the men was bald and had a mustache. In his interview with Detective Lopez 10 days after the shooting, Michael identified car #1 from the photo display and appellant as the shooter from a photographic lineup. At trial, Michael testified that he had identified the car honestly but that he did not remember which car it was or details about it, including whether it had a tinted rear

window or chrome wheels. Neither did Michael remember which suspect he had identified, but he claimed to have made a truthful identification.

Three adolescent-aged boys had been playing together just before the shooting. Investigating officers recorded interviews with each of them, and the recordings where played for the jury at trial.

In an interview three weeks after the murder, Noel told Visalia Police Officer Jason Salazar that he had been playing with Julian and another friend, T.J., at the corner of Divisadero and Ferguson, when he heard four shots. Noel looked out from Julian's garage and saw a "maroonish purple" car with a tinted rear window. There were "about four" people in the car, one of them a Hispanic male in the front passenger seat who was reloading the clip of a black gun. The car took off down Divisadero Street. Officer Salazar showed Noel the photo display of vehicles. He said the back of car #1 looked just like the car he saw. The color of car #1 didn't look right, but it was the closest of the three in the display. Noel was not able to identify any individuals from photographs. At trial, Noel testified that he remembered speaking to officers after the murder, but he did not remember seeing or hearing anything else. He did state he told the police the truth when he was questioned.

In an interview two weeks after the murder, Julian told Detective Lopez that he and his friends Noel and Troy had been at Noel's house, and were walking back to Julian's house located on Perez Street, when they heard "like four pops" coming from the next street, Ferguson. He saw four guys, and then a car "like zoom[ed]" away down Divisadero. The car was a four-door, "purple or like a maroon. . . almost black" Dodge Stratus with chrome rims. Julian identified car #1 as the right color, but thought the wheels looked different. Julian also identified appellant from three 6-packs of photographs as the front passenger in the car. At trial, Julian only remembered hearing four or five gunshots and seeing a "purple car," that looked similar to a Dodge Stratus with chrome wheels, "peeling out." He did not remember which car he had identified in his interview and did not remember seeing a photographic lineup of suspects.

The third boy of this group was Troy, or T.J., whom Detective Lopez interviewed two weeks after the murder. Troy said he and his friends were at Noel's home on Vine Street when they heard five or six shots. They jumped a fence and ran down Perez Street to Divisadero, where Troy saw a "maroon-red" car he thought was a Dodge or a Kia pass by. The car looked new and had chrome rims on the wheels that were "like you see through them - they were like this fat going up and you can see - like you could see the um - brake pads." The car "burned rubber" and was going fast. Troy thought the car was occupied by four Hispanic males, with the driver and right rear-seat passenger both wearing blue hats of some kind. Troy described the driver as about 20 without facial hair, and the front passenger as having short brown hair. Troy identified car #1 as closest in color to the car he had seen, but thought the color should be darker or more maroon. He also though the car he had seen was smaller. He did not recognize any suspects in the photographic lineups. At one point on the tape, Troy relayed that his mother had told him to say he didn't see anything because "those guys could find out and they could come shoot me" and "those guys can find out and comeback on me and my family." At trial, Troy remembered being with his friends Julian and Noel when he heard gunshots, but little else.

//

//

//

-4-

07cv00286

The Gang Evidence

Appellant had acknowledged gang membership during contacts with officers in both September and December 2001. He was affiliated with the South Side Kings (SSK). Appellant had a crown tattooed on the back of his head, a tattoo on his lip and tattoos behind both ears. The word "Kings" was tattooed on his chest, the letters "SSK" on his right shoulder, and the word "southerner" across his back. When officers searched appellant's apartment after his arrest in February 2002, they discovered a large amount of SSK gang and graffiti paraphernalia, including many writings in an "old English" font; handmade letters for stenciling; a blue album containing gang graffiti and photographs of SSK members; blue sports apparel; and a sports jersey with the number "13" on it. At the time of his arrest, appellant was wearing a shirt that said "Pappy Tokes" on the back. Appellant's gang moniker was "Toker," "Pappy Toker," or "Big Pappy Tokes." This was not, however, a unique nickname; many gang members in general use the "Toker" name.

Detective Kerry Kelly testified as a gang expert for the prosecution. Detective Kelly testified that graffiti was "another form of language that gang members use" to challenge and disrespect rival gang members, to claim turf, to recruit members, and also to cause fear in rival gangs. According to Detective Kelly, there are two major, rival gang factions: the northern affiliated gangs and the southern affiliated gangs. The SSK is the most active gang in Tulare County with over 350 members. Symbols associated with the SSK include a crown, a three-dot insignia representing a crown, the color blue, "Sureno," "Sur," "and the number 13." Common hand signs are a one and a three, or a "K." The northern, rival gangs use the color red, the number 14, and "Norteno."

Detective Kelly opined that the primary activities of the SSK are "crimes of opportunity" for the benefit of the gang. He stated those crimes are "generally" vandalism, theft, assault, and homicide. Certified copies of court records were introduced into evidence showing the murder conviction of Sammy Espinoza in March of 1999 and the manslaughter conviction of Humberto Anegus in February of 2000. Espinoza and Anegus were both members of the SSK when their crimes occurred.

According to Detective Kelly, Carlos Cortez was "at least an associate, and fairly active for an associate" of the northern or "Norteno" gangs. Cortez has admitted being a North Side Visa gang member. Detective Kelly did not know whether Cortez had a moniker. Frank Mendoza also was connected to northern gangs. The house next door to Mendoza's, which was in the area known as "Birdland," had a significant amount of gang graffiti, including a "memorial" to a Norteno homicide victim of a year earlier.

Detective Kelly testified about graffiti found in an area known as the Patterson Tract, an area some three miles from the scene of the murder and dominated by southern gangs at the time of the murder. Detective Kelly testified that Nortenos use red paint and Surenos use black paint to "tag." The graffiti in the Patterson Tract had red words which had been crossed out with black paint. The red graffiti had included "fuck all scraps," "187 Toker," and "Nightmare." Detective Kelly explained that "scraps" is a derogatory term used by the Nortenos for southerners. The reference to "187" is to the Penal Code statute for homicide. Detective Kelly opined that "187 Toker" indicated a possible imminent assault. Detective Kelly did not know who Nightmare was. Black paint had been used to cross out "Nightmare" with the words "dead shit," "Big Pappy," "Tokes," and "SSK."

Detective Kelly acknowledged that there were more than 150 gangs in Tulare County, that "Toker" was a common gang moniker, and that he did not know when the Patterson Tract graffiti had been done. On January 2, 2002, however, another officer had contacted appellant about that graffiti. Appellant had denied knowing anything about

it and said he did not know who Nightmare was.

Detective Kelly opined, based on a review of the reports and the scene, that Cortez's killing was committed for the benefit of the SSK and also in retaliation for the red graffiti in the Patterson Tract. On cross-examination Detective Kelly acknowledged that his opinion that his crime was done for the benefit of the SSK was based on the assumption that an SSK member committed the crime. When asked what evidence existed that the SSK committed the crime, Detective Kelly stated, "That [appellant] did the crime." Detective Kelly's opinion also was based on his assumption that appellant was an SSK member; that Cortez was a rival gang member; and that the crime was committed in the "middle of northern controlled turf" with gang graffiti directly across the street.

Defense

Several neighbors testified that they heard two different types of gunfire at the time of the murder. An attendee at a Quinceanera celebration the night before the shooting testified that Cortez had been present and was "upset with somebody." Cortez's date at the party saw that he had a gun in his waistband, but he did not display it during the party.

A neurophysiologist testified as an eyewitness identification expert. He testified about difficulties with accuracy in eyewitness identification and about memory decay.

Two prosecution witnesses were recalled by the defense. Police offier Randy Lentzner, who had been first to arrive at the scene of the shooting, testified that Julian, Noel and Troy all told him that day that they were on Perez Street, one street south of Ferguson, when the shooting occurred and did not see inside the vehicle. Detective Lopez testified that Michael told him the two suspects he saw with weapons were clean shaven and one had a shaved head.

Rebuttal

Officer Lentzner testified that he contacted Noel on the day of the incident and spoke with him, Julian and Troy together only briefly, perhaps for 30 seconds. Noel told Officer Lentzner he had been on Perez Street when he heard the shots. He told Officer Lentzner he could not see inside the vehicle or identify anyone in the car.

Another officer who arrived at the scene, Detective Dennis Wright, testified that he spoke to Noel, who described the vehicle as a small, clean, dark-colored burgundy vehicle with four Hispanic male occupants. Noel told the detective one of the individuals in the front seat appeared to be reloading a handgun.

Detective Wright testified that he interviewed Julian on the day of the murder. Julian lived on Perez Street, one block immediately south of the crime scene. Julian told Detective Wright he heard gunshots and saw a purple, four-door Dodge with chrome trim speed away from Divisadero and Ferguson. He described generally the four men in the car as Hispanic males, but said he might be able to identify the driver.

(Lodgment No. 4 at 2-10.)

//

//

//

1    //

2    **III.    PROCEDURAL BACKGROUND**

3         On September 12, 2002, the Tulare County District Attorney's Office filed an amended

4    information charging Richard Avenida with one count of murder (a violation of Penal Code section

5    187); one count of attempted murder (a violation of Penal Code sections 664 and 187); one count of

6    felony shooting at an inhabited dwelling (a violation of Penal Code section 246), and street terrorism

7    (a violation of Penal Code section 186.22(a)). (*See* Lodgment No. 10 at 183.) The amended information

8    further charged that during the crimes Petitioner personally discharged a firearm, and that the crimes

9    were committed for the benefit of, or in association with, a criminal street gang (a violation of Penal

10   Code sections 12022.53 (d)(e)(1) and 186.22(b)(1)). (*Id.*) On September 23, 2003, a jury found Avenida

11   guilty of all charges. (Lodgment No. 1 at 563.)

12        On May 24, 2005, Avenida appealed his conviction to the California Court of Appeal.

13   (Lodgment No. 1.) The state appellate court affirmed the judgment on August 15, 2005. (Lodgment

14   No. 4.) On September 16, 2005, Avenida filed a petition for review in the California Supreme Court.

15   (Lodgment No. 5.) The petition for review was denied on November 16, 2005. (Lodgment No. 6.)

16        On February 18, 2007, Avenida filed a habeas petition in the California Supreme Court.

17   (Lodgment No. 7.) The petition for was denied on July 25, 2007. (Lodgment No. 8.)

18        Avenida filed the present Petition for a Writ of Habeas Corpus in this Court on February 13,

19   2007. [Doc. No. 1.] On May 8, 2008, Respondent filed an Answer and lodged portions of the state

20   court record. [Doc. No. 11.] Avenida filed a Traverse on July 23, 2008. [Doc. No. 18.]

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1   //

2   **IV.    DISCUSSION**

3          **A.    Scope of Review**

4          Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal

5   habeas corpus claims:

6                  The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
                   entertain an application for a writ of habeas corpus in behalf of a person in custody
7                  pursuant to the judgment of a State court only on the ground that he is in custody in
                   violation of the Constitution or laws or treaties of the United States.
8

9   28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

10         The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996

11  ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).   As amended, 28 U.S.C. § 2254(d) reads:

12                 (d) An application for a writ of habeas corpus on behalf of a person in custody
                   pursuant to the judgment of a State court shall not be granted with respect to any claim
13                 that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of
                   the claim –
14
                          (1) resulted in a decision that was contrary to, or involved an
15                        unreasonable application of, clearly established Federal law, as
                          determined by the Supreme Court of the United States; or
16
                          (2) resulted in a decision that was based on an unreasonable
17                        determination of the facts in light of the evidence presented in the State
                          court proceeding.
18

19  28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

20         Because the Petition was filed after AEDPA's effective date, and because the claims were

21  adjudicated on their merits in the state courts, Avenida must satisfy either § 2254(d)(1) or § 2254(d)(2)

22  to obtain federal habeas relief.  *See Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme Court

23  interprets § 2254(d)(1) as follows:

24                 Under the "contrary to" clause, a federal habeas court may grant the writ if the state
                   court arrives at a conclusion opposite to that reached by this Court on a question of law
25                 or if the state court decides a case differently than this Court has on a set of materially
                   indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas
26                 court may grant the writ if the state court identifies the correct governing legal principle
                   from this Court's decisions but unreasonably applies that principle to the facts of the
27                 prisoner's case.

28  *Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

1   //

2       Where there is no reasoned decision from the state's highest court, the Court "looks through"

3   to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).

4       **B.    Analysis**

5       Avenida raises two issues:  (1) there was insufficient evidence to support his convictions for

6   murder, attempted murder and shooting at an inhabited building, and (2) he was denied the effective

7   assistance of counsel because counsel failed to request limiting pinpoint jury instructions about gang

8   evidence.  (Pet. at 9, 29.)  Respondent argues that the state courts' denial of the claims was neither

9   contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 14,

10  17.)

11      **1.    Insufficient Evidence**

12      Avenida argues that there was insufficient evidence at trial to identify him as the perpetrator of

13  the crimes because multiple  eyewitnesses presented conflicting testimony concerning their

14  identification of him and his vehicle.  (Pet. at 9.)  Avenida contends that he was convicted solely on the

15  strength of the gang and gang opinion evidence because there was a lack of sufficient evidence

16  identifying him as the shooter.  (*Id.*)  Respondent counters that the appellate court's denial of this claim

17  is a reasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979), because the verdicts were based

18  upon substantial evidence.  (Answer at 11.)

19      In evaluating the merits of the claim, this Court must look through to the last reasoned state court

20  decision.  *See Ylst*, 501 U.S. at 801-06.  Here, because the California Supreme Court summarily denied

21  Avenida's petition  (Lodgment No. 6), the last reasoned state court decision came from the California

22  Court of Appeal.  (Lodgment No. 4.)  That Court stated:

23              At the end of the prosecution's case-in-chief, defense counsel made a section
        1118.1 motion, arguing the evidence was insufficient to support a conviction because of
24      the lack of any in-court identification of appellant and the lack of corroboration of the
        out-of-court identifications.  Defense counsel also argued there was no in-court
25      identification of appellant's car and that the various witnesses who had identified the car
        out of court had recalled different specifics about the car.  Finally, defense counsel noted
26      there was no evidence about when the graffiti described by Detective Kelly was written
        and no connection made between the name "Nightmare" and either Cortez or Mendoza.
27      The trial court denied the motion.  On appeal, appellant agues that "the trial court erred
        in this determination, and that the judgment should be reversed for insufficient
28      evidence."  We disagree.

-9-

//

> "In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court applies the same standard an appellate court applies in reviewing the sufficiency of the evidence to support a conviction, that is, 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the charged offense.' [Citations.] [Citation.] 'Where the section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1212-1213.)

> The prosecution evidence showed that appellant drove a 1996 four-door, purple, Chrysler Cirrus, which six people - Mendoza, Vargas, Michael, Noel, Troy, and Julian - identified as similar to the assailants' car. Two people, Michael and Julian, identified appellant as the shooter from the photo lineups. Clothing like that described by Mendoza as being worn by the shooter was found in appellant's apartment two weeks after the crime. Though the graffiti in the Patterson Tract could not be dated, there was evidence that appellant was aware of it because he had discussed it with an officer before the murder. Evidence seized from appellant's apartment demonstrated his interest in graffiti.

> . . . .

> Under the substantial evidence test, "the probative value of the identification and whatever other evidence there is in the record are considered together to determine whether a reasonable trier of fact could find the elements of the crime proven beyond a reasonable doubt." (*People v. Cuevas*, supra, 12 Cal.4th at p. 274.) Viewing the record in the light most favorable to the judgement, we find substantial evidence to support appellant's conviction.

(Lodgment No. 4 at 10-11, 13.)

In assessing a sufficiency of the evidence claim, the Supreme Court has stated that "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005), quoting *Jackson*, 443 U.S. at 319.

### Eyewitness Identification of the Purple Car and Petitioner

Avenida claims that the witnesses who identified his car as the car fleeing the scene noted that the car leaving the area had a tinted rear window, chrome wheel rims, and see-through hubcaps, which his car did not have. (Pet. at 9.) In addition, Petitioner argues that the evidence identifying him as the perpetrator was thin because no-one identified him at trial, and the two witnesses who identified him out of court made inconsistent statements. (*Id.*) According to Avenida, one of the witnesses said that

he "looked like" the front-seat passenger in the assailant's car, but previously told an officer that he was only able to identify the driver.  (*Id.*)  The second witness chose Petitioner out of a photo-lineup "based upon what he saw from a vantage point 175 feet away from the crime scene."  (*Id.*)  In his Traverse, Avenida argues the grounds relied upon by the court of appeal in its denial of this claim are insufficient to sustain the conviction, including the court's reliance on the eyewitness identifications of him and his car.  (Traverse at 9-14.)

Respondent counters that the Petition does not address the clearly established federal law in this area, or AEDPA's review standard, but instead offers a summary of witness testimony that emphasizes the inconsistencies in that testimony, in essence asking this Court to impermissibly reweigh the evidence.  (Answer at 11.)  Respondent asserts that the claim should be denied because the appellate court properly applied *Jackson*, and found that there was sufficient evidence to support the conviction.  (*Id*. at 12.)

The appellate court correctly applied the *Jackson* rule to Avenida's claim that the identification of Petitioner's car by multiple witnesses, and the out-of-court identification of Avenida by two witnesses was sufficient to sustain the convictions.  In its disposition of this claim, the appellate court noted that, "the court must review the whole record in the light most favorable to the judgement below to determine whether it discloses substantial evidence - that is, evidence which is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (Lodgment No. 4 at 12, fn 2.)  As noted above, the appellate court stated that the evidence showed Avenida possessed a 1996 four-door, purple Chrysler Cirrus, and six witnesses - Mendoza, Vargas, Michael, Noel, Troy and Julian - described the assailant's car as very similar.

While Petitioner is correct that some of the witnesses stated that the car had different features, there was consensus that the car was most like Avenida's car than others in the photo lineups. According to Petitioner, Noel did not identify the car, but instead excluded it because he said it was not the right color and the only thing that was similar was the rear of the car.  (Traverse at 7.)  In his interview, Troy was shown the lineup of three cars that included Petitioner's as number one.  A complete reading of the transcript demonstrates that Noel identified Avenida's car, and though he initially thought the color wasn't right, he ultimately indicated that the color of Avenida's car was most

07cv00286

1  like the car he saw that day:

2  //

3  //

4      Interviewer:    Look at those cars and tell me if you see the one you saw that day.
    Noel:    It was this one, the red one.
5      Q:    It was that car?
    A:    Yeah.
6      Q:    Are you sure it was that car?
    A:    I seen the back right here; it was turning the corner and (inaudible) like that.  I
7          seen that just turn the corner (inaudible).
    Q:    Okay. Did you see the license plate of the car?
8      A:    No.
    Q:    No? But the car that you saw looked just like that one?
9      A:    Yeah.
    Q:    Same color?
10     A:    Uh-uh, not really, not that kind of color.
    Q:    But the back of it was the same?
11     A:    Yeah, it looked like the back of it.
    Q:    Can you tell me the number under that?
12     A:    Number one.
    Q:    Number one?
13     A:    Yeah.
    Q:    Okay, and that's on see the line up of the three vehicles, number one. Is there a
14         color on any of those other cars that looks more like it, or - -
    A:    Hmm.
15     Q:    - - which color is the closest to either one you saw?
    A:    This one right here.
16     Q:    The same one?
    A:    Number one.
17     Q:    Number one?
    A:    Yeah.

18

19 (Lodgment No. 10 at 582-83.)

20 As the record reflects, Noel identified Avenida's car as the one he saw leaving the crime scene, and

21 closest in color to that car.  Accordingly, the court of appeal reasonably included Noel's identification

22 as evidence supporting the conviction.

23       Next Avenida contends that Troy ("TJ") Hager's identification of the car was "even farther

24 afield" because he thought the car was a Dodge or a Kia, and because he told the detectives that the car

25 in the lineup "wasn't the car."  (Traverse at 7.)  As with other witnesses, Troy was shown the lineup of

26 three cars that included Petitioner's as number one.  (Lodgment No. 10 at 370-71.)  As Petitioner notes,

27 the first thing Troy said was "that wasn't the car," however because Troy was looking at a lineup of

28 three cars, it is impossible from the record to tell which car he was indicating.  When asked which car

was closest in color to the car he saw fleeing the scene, Troy pointed to number one, Avenida's car. (*Id*.) Troy indicated that he thought the car he saw was smaller and a little darker than the car in photograph number one, but identified the color of the car as purple, as other witnesses had. (*Id*. at 600.) Given his identification of Avenida's car as being closest in color to the fleeing vehicle, it was reasonable for the court of appeal to rely on his identification in support of the conviction.

Petitioner argues that the identifications by Salvador Vargas and Francisco Mendoza are similarly flawed, making the court of appeal's determination unsupportable. (Traverse at 8.) During trial, Vargas could not remember which car he had identified from the photo lineup, but stated that in terms of color it was closest to number one, Avenida's car. (Lodgment No. 9 at 161.) Vargas stated that he thought the car was a Dodge Stratus. (*Id*.) Avenida argues that this makes the identification unsound. However, the detective who chose the three cars for the lineup said he picked models which were either Dodge Stratus or Chrysler Cirrus because they have the same body type. (Lodgment No. 9 at 370.) An eyewitness could easily mistake a Dodge Stratus for a Chrysler Cirrus due to the similar shapes. Vargas identified the color and body style of Avenida's car, therefore Vargas' statement that it was a Dodge Stratus does not render his identification unreliable and the court of appeal properly relied upon it in support of the convictions.

Eyewitness Mendoza identified car number one, Avenida's car, as being the most similar to the one he saw that day when he was shown a photographic lineup. (*Id*. at 70.) Mendoza also identified the car as similar to a Dodge Stratus, and stated that it was "purplish" in color during his testimony. (*Id*. at 60.) According to Petitioner, Mendoza insisted Avenida's car was not the right one when he viewed it at the towing yard. (Traverse at 8.) However, a full reading of the trial transcript shows that while Mendoza initially said he was not one-hundred percent sure it was the car because the color and grille looked different, when the car was pulled out into the sun he stated that "it looked the same as the car I saw that day." (*Id*. at 82.) Even when discussing the different grille shape, Mendoza commented that the car he saw had the same body shape as the Dodge Stratus. (*Id*. at 81.) As noted above, the Dodge Stratus and Chrysler Cirrus have similar body types. Accordingly, a rational trier of fact could draw reasonable inferences from the totality of the evidence that, even though some witnesses reported different details of the purple car, the evidence pointed to Avenida's purple Cirrus. *See Jackson*, 443

1   U.S. at 319.

2   //

3   //

4       Avenida further argues that eyewitness Julian Hernandez did not positively identify him or his

5   car citing Julian's recorded interview with Visalia police. (Traverse at 7-10.) The interview transcript

6   reveals that Julian made reliable identifications and the court of appeal properly determined that his

7   eyewitness identification provided sufficient support for Avenida's conviction. Detective Lopez, who

8   gave the interview, repeatedly advised Julian that he should feel no pressure to make a positive

9   identification from the car and suspect photo lineups simply because a police officer was showing him

10  the photos. (Lodgement No. 10 at 616-17.) Julian reported that after hearing the gunshots, he saw four

11  Hispanic men drive away from the scene in a dark purple four-door "Dodge Stratus." (Lodgment No.

12  10 at 610-616.)

13      Avenida strenuously argues that because Julian began by saying he was unsure whether he could

14  identify anyone except the driver of the car, but later identified Avenida, his identification is not reliable.

15  (Traverse at 8-9.) On the contrary, the transcript reveals that Julian initially had difficulty remembering

16  even the simplest details about the event, such as the time of day when it occurred, but was able to recall

17  them as he and the detective talked. When he was shown eighteen photographs of men who potentially

18  fit the description, Julian said that Avenida looked familiar, and identified him as the passenger in the

19  car. (Lodgment No. 9 at 619-20.) Given Detective Lopez's advisement to Julian that he need not

20  identify someone simply because he appeared in the lineup, it is reasonable to conclude that Julian did

21  not merely select someone because he thought he must.

22      Avenida also argues in the Traverse that Julian's identification of his car was unreliable.

23  Detective Lopez showed Julian the same lineup of three automobiles as was shown to the other

24  witnesses, with car numbered one being Avenida's vehicle. (Lodgment No. 9 at 617-18.) Julian looked

25  at the photographs, saw Avenida's car, noted that it looked like the car he saw, that the color was right,

26  but that the wheels did not look right. (*Id.*) Avenida seizes on Julian's comments that the wheels did

27  not look right to claim that this nullifies Julian's identification and makes the court of appeal's

28  determination that there was sufficient evidence erroneous. In light of the fact that Julian identified

-14-

Avenida's car as similar in both body style and color to the car he saw leaving the crime scene, it is clear that a rational trier of fact could readily find Julian's identification reliable, despite his recollection of different wheel details. The appellate court appropriately relied on this evidence in its denial of this claim. *See Jackson*, 443 U.S. at 319.

Petitioner further contends in his Traverse that Michael Yado's identification was unreliable, and because the state's case relied entirely on this identification, the court of appeal's denial of this claim is unreasonable. (Traverse at 10.) The Court disagrees. Avenida argues that because Michael did not remark on Avenida's distinctive crown tattoo on the back of his head, mustache and hair on his chin, his identification is unsound. (*Id*.) Avenida also contends that Michael was 175 feet from the suspect and there is no possible way that he could have seen Petitioner's face sufficiently to make a positive identification from that distance. (*Id*.)

Petitioner is incorrect in claiming Michael could not see him sufficiently to identify distinctive cues such as facial hair. Michael was close enough to the suspect to clearly describe seeing a bald man with a mustache get out of the passenger side door of a dark colored car, instantly pull his hood over his head, run toward Mendoza's garage in a crouched position, and then start shooting. (Lodgment No. 9 at 427, 436-37.) Avenida was bald and had a mustache when the crime was committed. (Lodgment No. 9 at 246-48, 772.) The court of appeal was not unreasonable in relying on this eyewitness identification in support of the conviction. *See Jackson*, 443 U.S. at 319.

In addition to the fact that the eyewitness identifications were reliable, the witnesses were cross-examined and appropriate jury instructions regarding eyewitness identifications were given as the court of appeal noted in its denial of this claim. The trial court gave the jury CALJIC Nos. 2.91 [Burden of Proving Identity Based Solely on Eyewitnesses][1] and 2.92 [Factors To Consider in Proving Identity by Eyewitness Testimony][2] which informed the jury that the burden was on the prosecution to prove

---

[1]CALJIC No. 2.91 as read to the jury states: "The burden is on the People to prove beyond a reasonable doubt that the defendant is the person who committed the crime with which he is charged. If after considering the circumstances of the identification and any other evidence in the this case you have a reasonable doubt whether the defendant was the person who committed the crime, you must give the defendant the benefit of the doubt and find him not guilty." (Lodgment No. 9 at 720.)

[2]CALJIC No. 2.92 as read to the jury stated: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged. In determining the weight to be given eyewitness testimony, you should consider the believability of the eyewitness, as well as other factors

-15-

beyond a reasonable doubt that Avenida was the person who committed the crime. The jury also considered the variation in testimony between out of court identifications and the lack of in court identifications and apparently found the out of court identifications to be credible. Avenida introduces no new evidence which suggests that any of the witnesses had any bias or motive to falsely implicate him. Considering the evidence regarding the identification of Avenida and his car in the light most favorable to the prosecution, it is clear that the court of appeal correctly found sufficient evidence supported the verdict. *See Jackson*, 443 U.S. at 319.

### *Clothing Found in Apartment*

Avenida also contends that the clothing found in his apartment lends "no support to the verdict. (Traverse at 13.) Avenida acknowledges that witness Mendoza saw one of the shooters in a "bluish black windbreaker" with a hood (Lodgment No. 9 at 60-61, 73, 77-78), and Michael stated that the shooters pulled hoods over their heads (Lodgment No. 9 at 426, 456.)

Police found at least two dark colored wind jackets with hoods in Avenida's apartment after he was arrested. (*Id*. at 381-83.) In light of the descriptions by eyewitnesses that the shooter was wearing a dark colored hooded sweatshirt or jacket and the discovery of many dark colored hooded jackets in Petitioner's apartment, a rational trier of fact could reasonably conclude that the clothing found in Avenida's possession circumstantially linked him to the crime, and therefore, the court of appeal did not commit error when it relied on this as one factor demonstrating that sufficient evidence supported the convictions. *See Juan H*., 408 F.3d at 1274-75.

//

//

---

which bear upon the accuracy of the witness's identification of the defendant, including, but no limited to any of the following: ¶ The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act; ¶ The stress, if any, to which the witness was subjected at the time of the observation; ¶ The witness's ability following the observation to provide a description of the perpetrator of the act; ¶ The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness; ¶ The witness's capacity to make an identification; ¶ Evidence relating to the witness's ability to identify other alleged perpetrators of the criminal act; ¶ Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup; ¶ The period of time between the alleged criminal act and the witness's identification' ¶ Whether the witness had prior contacts with the alleged perpetrator; ¶ The extent to which the witness is either certain or uncertain of the identification; ¶ Whether the witness's identification is, in fact, the product of his own recollection; ¶ And any other evidence relating to the witness's ability to make an identification." (Lodgment No. 9 at 721-22.)

1    //

2    //

3    //

4    *Gang-Related Evidence*

5    Avenida contends that he was convicted due to "gang opinion" evidence despite the lack of

6    corroborated eyewitness identifications because he is an admitted Sureno gang member, even though

7    there was "no direct or circumstantial evidence establishing that the shooting in this case was a gang

8    conflict."  (Pet. at 9-10.)  In his Petition, Avenida summarizes the gang evidence presented at trial,

9    including a recitation of Detective Kelly's testimony and opinions related to gang evidence. (*Id*. at 22-

10   26.)  Avenida further argues that the graffiti evidence is "utterly meaningless" because the state's

11   argument that the shooting was related to the graffiti in the Patterson Tract was outrageous, stating that

12   "no meaningful inferences can be gleaned from such spurious circumstances."  (Traverse at 15.)

13   The Court finds that the state courts applied the appropriate standard in finding that the

14   circumstantial graffiti evidence provided support for the conviction.

15   During the section 1118.1 hearing, the trial court stated:

16   I look at this case as under the evidence most favorable to the prosecution.  And
     regardless whether it is a good rule or not, we have out-of-court identifications.  We have
17   in-court identifications that tends to corroborate that, which is that this automobile seems
     to be similar to the automobile that was hooked up with the defendant. ¶ And we have
18   this motive of the graffiti challenge, and the response to that with the expert from the
     gang unit of how the gangs respond to these types of direct challenges. ¶ There is
19   sufficient evidence, if believed by the jury, to support a conviction.

20   (Lodgment No. 9 at 605-06.)

21   As the court of appeal noted, "[t]hough the graffiti in the Patterson Tract could not be dated, there was

22   evidence that appellant was aware of it because he had discussed it with an officer before the murder.

23   Evidence seized from appellant's apartment demonstrated his interest in graffiti." (Lodgment No, 4 at

24   10-11.)  "Viewing the record in the light most favorable to the judgement, we find substantial evidence

25   to support appellant's conviction." (*Id*. at 13.)

26   The record supports the appellate court's determination.  On January 2, 2002, a police officer

27   contacted Avenida to ask him about the graffiti in the Patterson tract which illustrated an ongoing

28   challenge between Sureno and Norteno gang members named "Toker" and "Nightmare," demonstrating

                                            -17-

that Petitioner was made aware of the challenge. (Lodgment No. 9 at 476-77.) Petitioner is a self-proclaimed Sureno gang member who goes by the moniker "Toker." (*Id*.) On January 21, 2002, two associates of the Norteno gang were fired upon, one shot to death, in an area dominated by Norteno gang members. A search of Avenida's apartment revealed homemade Old English stencils of various letters and notebooks with various Sureno gang memorabilia. (*Id*. at 380.) Any rational trier of fact could have drawn a logical conclusion from the circumstantial evidence of Avenida's possession of graffiti paraphernalia and the ongoing graffiti dispute between someone with the same moniker as Avenida and members of the Norteno gang that graffiti evidence was meaningful and provided circumstantial support for the conviction. *See Juan H*. 408 F.3d at 1274-75.

As illustrated above, the trial court and the appellate court applied the appropriate standard in analyzing Avenida's claim. The appellate court reviewed the record and reasonably applied the standard as set forth in *Jackson* finding that the verdict was rational and supported by substantial evidence that included not only the gang evidence, but also the eyewitness identifications of Petitioner and his car, and that clothing similar to that worn by the assailant was found in his apartment. While there were inconsistencies in witness testimony and other evidence suggesting Avenida was not the shooter, the jury is entitled to disbelieve that evidence and believe the evidence which supports his conviction. Avenida offers no new evidence which suggests that the trial court's findings of fact, or the appellate court's denial of this claim were erroneous. Accordingly, the state court's denial of this claim was not contrary to, nor an unreasonable application of, clearly established United States Supreme Court law. *Williams*, 529 U.S. at 412-13.

2. **Ineffective Assistance of Counsel**

In claim two, Avenida argues that his Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated by trial counsel's failure to request eight pinpoint limiting instructions about the permissible use of the graffiti, gang, gang-expert opinion, and criminal history evidence. (Pet. at 29.) Respondent counters that the state court properly applied *Strickland v. Washington*, 466 U.S. 668, 700 (1984), in denying Petitioner's claim. (Answer at 14.)

Avenida raised this claim in a habeas corpus petition submitted to the California Supreme Court which was silently denied. (Lodgment Nos. 7, 8.) Where the dispositive state court order "supplies

no reasoned decision," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (citing *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)). "Federal habeas review is not de novo when the court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." *Id.* An independent review of the record is the only method available to determine whether a silent state court denial was objectively unreasonable. *Himes*, 336 F.3d at 853. Even with an independent review, the federal court "still defer[s] to the state court's ultimate decision." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. He must also show he was prejudiced by counsel's errors. Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). Further, *Strickland* requires that "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland*, 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. The Court need not address both deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

Avenida argues that his trial counsel's performance was deficient because he did not request appropriate instructions "along the lines indicated in CALJIC No. 2.50 and *People v. Contreras*, 144 Cal.App.3d 749, 755 n.2, 758 (1983)". (Pet. at 33.) Specifically, Petitioner claims counsel should have requested pinpoint instructions which told the jury: (1) that it could not consider gang-related evidence when deliberating on the issue of the identity of the shooter; (2) that it could only consider the expert's opinions about the authorship of the black graffiti in deliberations about the credibility of his opinions regarding whether the crime was committed for the benefit of a street gang (count four), and the gang-

07cv00286

related enhancements on counts one through three; (3) that it could not consider evidence of Avenida's

gang membership and prior contacts with law enforcement when deliberating on counts one and two,

but only when deliberating on count four and the gang-related enhancements on counts one through

three; (4) that it could not consider the expert's testimony concerning the "primary activities" of the

gang when considering Avenida's propensity to commit the crimes charged in counts one through three,

but only when deliberating on count four and the gang-related enhancements in counts one through

three; (5) that they should not consider the expert's testimony concerning the ongoing conflict between

the

Nortenos and Surenos "save for the limited purpose of assessing the credibility of" the expert that the

crime was committed for the benefit of the SSK (South Side Kings); (6) that they could not draw the

inference from the fact that Petitioner's moniker was "Toker" that he was known to smoke marijuana;

(7) that the gang expert's opinion that "Petitioner was guilty" could not be considered when deliberating

on the identity of the shooter, but could only be used in their deliberations about the gang-expert's

opinion that the crime was committed for the benefit of the SSK; and (8) that they could not use graffiti

evidence as evidence of his "bad character or disposition to commit crimes" such as those charged in

counts one through three, but only when deliberating about whether the crime was committed for the

benefit of the SSK   (Pet. at 33-35.)

Petitioner argues that instructions along the lines of those given in *Contreras* should have been

requested by defense counsel. (Pet. at 33.)  In *Contreras*, the trial court held that evidence of the

defendant's membership in a gang was properly admitted because it was relevant to both identity and

motive where defendant had been among a group of twenty to thirty-five men who attacked off-duty

bank security guards.  144 Cal. App. 3d at 749.  In affirming the trial court's admission of the gang

evidence, the appellate court noted that the trial court had immediately admonished the jury after the

evidence was introduced that evidence of defendant's gang membership "was being admitted for limited

purposes and could not be considered as evidence of bad character or propensity to commit crime" and

at the close of the trial instructed the jury with CALJIC No. 2.50[3], on the limited purpose for which evidence of gang membership was admissible. *Id*. at 755. Avenida argues that trial counsel should have requested "limiting instructions along the lines of CALJIC 2.50, but tailored to the specific excesses of the State's case." (Pet. at 33-36.)

The record reflects that Avenida did not suffer ineffective assistance of counsel for defense counsel's failure to request these pinpoint instructions. Prior to trial, defense counsel attempted to exclude gang-related evidence arguing that there was no evidence to support the special allegation on count four that the crime was committed for the benefit of a street gang. (Lodgment No. 9 at 1.) The trial court found there was sufficient evidence to support the allegation, despite it being largely circumstantial evidence. (*Id*. at 17-18.)

Recognizing that the evidence against his client was circumstantial, defense counsel pursued a theory of misidentification in light of equivocating eyewitnesses, and argued there was evidence suggesting that the shooting was the result of confrontations the victim had at a quincenerra party the night before the shooting. (Lodgment No. 9 at 776.) In support of this theory, counsel emphasized the discrepancies in the testimony of eyewitnesses who described the purple car, and its occupants. (*Id*. at 701-04.) The two eyewitnesses who identified Avenida were cross-examined, and counsel illustrated how Michael Yado was only able to see the perpetrator for a brief moment while hiding behind a car, (*id*. at 455-56), and Julian Hernandez's identification of the car and car occupants varied over time (*id*. at 234-37, 784). Counsel also called an eyewitness identification expert who testified about the brain processes associated with making accurate identifications and the effects of previous impressions and time on those identifications. (*Id*. at 633-692.) The expert testified that distinctive cues such as tattoos and facial hair are seldom forgotten by eyewitnesses. (*Id*. at 648-49.) Counsel argued in closing that Petitioner had a mustache, chin-tuft, and very distinctive tattoos at the time of the crime, yet the

---

[3]"CALJIC No. 2.50, as modified, was given to the jury as follows: Evidence has been introduced that the defendant is a member of a particular gang. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] The identity and motive of the person who committed the crimes, if any, of which the defendant is accused. [¶] The existence or nonexistence of a bias or interest of any witness. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose." *Contreras*, 144 Cal.App.3d at 755 n.2 (1983).

witnesses described the shooter as "clean-shaven," therefore, in light of the inconsistent witness identifications and failure to report these distinctive cues, Avenida was misidentified as the shooter. (*Id*. at 785.)

//

//

//

Counsel also called witnesses who testified that the victim, Cortez, was angry and possessed a gun at the quincenerra the night before the killing. (Lodgment No. 9 at 577-590.) These witnesses reported that Cortez was upset because some guy "was disrespecting him." (*Id*. at 577.) His date reported seeing Cortez with a gun under his formal wear while riding in the limousine. (*Id*. at 580-81.) Counsel argued in closing that the evidence linking Avenida to the graffiti and the shooting was completely speculative, and that there was just as much reason to speculate that "something happened at the party the night before that caused these events." (*Id*. at 776.) Through the assertion of a misidentification defense during trial and closing argument, counsel pursued sound strategy.

Counsel wisely refrained from requesting jury instructions like those proposed by Petitioner and instead focused their attention on the misidentification theory. Because the crime took place in an environment rife with gang violence, any attempt by counsel to limit the jury's use of the gang evidence in such a way could have seemed to ignore the obvious and appear disingenuous. Additionally, CALJIC No. 2.50 directs a jury to limit their use of gang evidence for purposes of identity and motive, and with Petitioner's suggested modifications, it potentially could have redirected the jury's attention to the gang evidence when counsel's strategy was to show Avenida was not the shooter, regardless of his gang status or whether the shooting was gang-related.

Instead, the trial court gave instructions to the jury which outlined their duty to independently determine whether the facts were proven to support the misidentification theory, including CALJIC Nos. 2.91 [Burden of Proving Identity Based Solely on Eyewitnesses] and 2.92 [Factors To Consider in Proving Identity by Eyewitness Testimony] which informed the jury that the burden was on the prosecution to prove beyond a reasonable doubt that Avenida was the person who committed the crime. In addition, the court gave the general instruction that the burden was on the prosecution to prove each

element of the crimes charged in counts one and two beyond a reasonable doubt.[4]

//

Furthermore, the pinpoint instructions Avenida suggests in numbers two, five and seven largely concern the weight to give the expert's opinions, and his credibility. (Pet. at 34-35.) The trial court instructed the jury regarding expert testimony with CALJIC No. 2.80 as follows:

> In determining what weight to give to any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion. An opinion is only as good as the facts and reasons upon which it is based. ¶ If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion. ¶ Likewise, you must consider the strength and weaknesses upon which it is based. ¶ You are not bound by an opinion. Give each opinion the weight you find it deserves. You may disregard any opinion if you find it to be unreasonable.

(Lodgment No. 9 at 718-19.)

It would have been duplicative for the jury to be instructed with pinpoint instructions numbers two, five and seven which required them to consider certain pieces of evidence only as they relate to the expert's credibility and for no other purposes.

In essence, the pinpoint instructions Avenida now believes were necessary would have restricted the jury's use of any gang related evidence from their consideration of counts one and two and would have required, as CALJIC No. 2.50 does, that they limit their use of gang evidence to prove identity or motive of the perpetrator, or to show bias on the part of a witness. However, the failure to request pinpoint instructions limiting the jury's consideration of gang evidence when deliberating on counts one and two was not ineffective assistance because counsel argued the defense of misidentification in closing and general instructions were before the jury to support the theory. *See Weighall v. Middle*, 215 F.3d 1058, 1063 (9th Cir. 2000)(trial counsel's failure to request additional instructions was not error where counsel argued theory of self-defense and general instruction was given which covered theory.)

---

[4]CALJIC No. 2.90 [Presumption of Innocence - Reasonable Doubt- Burden of Proof] as given to the jury states: " A defendant in a criminal action is presumed to be innocent until the contrary is proved. In a case of a reasonable doubt, whether his guilty is satisfactorily shown, he's entitled to a verdict of not guilty. ¶ This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. ¶ Reasonable doubt is defined as follows: It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." (Lodgment No. 9 at 720.)

Even if counsel's performance was deficient, Avenida suffered no prejudice because there was substantial circumstantial evidence that connected Avenida to the shooting and therefore the result would not have been any different even had counsel requested the instructions. The record reflects that Avenida had possession of a purple car at the time of the shooting which was the car in which he was apprehended. (Lodgment No. 351-56, 371-72.) Multiple witnesses identified the purple car in a photographic lineup as the car they saw in connection with the shooting. (Lodgment No. 9 at 69-71, 83, 370-71, 402-03, 457-59; Lodgment No. 10 at 581-53.)

Sergeant Ludwig testified that he contacted Avenida about graffiti in the Patterson Tract that indicated an ongoing conflict between the Nortenos and Surenos. (Lodgment No. 9 at 476-77.) The prosecutor asked Sgt. Ludwig, "After having read what was on the wall, did you attempt to contact an individual by the name of Toker?" Ludwig answered "Yes," and the prosecutor asked "And who did you contact that you knew to be - - that went by the name of Toker?" Ludwig responded, "Richard Avenida." (*Id*. at 476.) During the interview with Sergeant Ludwig, Avenida admitted being a member of SSK and that his gang moniker was "Toker." (*Id*. at 476-77.) When Avenida was arrested, he was wearing a t-shirt that displayed a diminutive form of Toker, "Papy Tokes," on the back. (Lodgment No. 9 at 385.)

The jury was instructed that it must draw logical and reasonable inferences from circumstantial evidence, and that it was required to find each fact beyond a reasonable doubt before rendering a guilty verdict based solely on circumstantial evidence.[5] (Lodgment No. 9 at 712.) Even if the jury's consideration of the evidence had been limited based on the pinpoint instructions, there remained considerable evidence linking Avenida to the crime from which a reasonable jury could have drawn the logical conclusion that he was guilty of the crime. Accordingly, there is not a reasonable probability that there would have been a more favorable outcome of the case had defense counsel sought the eight limiting instructions, and Avenida suffered no prejudice under *Strickland*. Therefore, the court of

---

[5]The trial court instructed the jury with CALJIC No. 2.00 [Direct and Circumstantial Evidence- Inferences] and CALJIC 2.01 [Sufficiency of Circumstantial Evidence- Generally]. CALJIC No. 2.00 as read to the jury states in pertinent part: "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence. It is not necessary that facts be proved by direct evidence. They may be proved, also, by circumstantial evidence or by a combination of direct and circumstantial evidence.

appeal's dismissal of this claim was not contrary to, or an unreasonable application of, clearly
established United States Supreme Court law.     *Williams*, 529 U.S. at 412-13.

**V.      CONCLUSION**

        Having carefully considered Avenida's Petition, Respondent's Answer and Memorandum of
Points and Authorities in Support of the Answer, all the documents and legal authorities submitted by
the parties, for all the foregoing reasons the Court **DENIES** the petition.  The Clerk of Court is directed
to enter a judgment denying the petition with prejudice.

        **IT IS SO ORDERED.**

**DATED:  March 25, 2009**

_____
**M. James Lorenz**
**United States District Court Judge**

COPY TO:

HON. LOUISA S. PORTER
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL

-25-

07cv00286